■ HELEN KNISH et al., Appellants, v JOHN F. MEEHAN et al., Respondents. [737 NYS2d 423] —Mercure, J.P. Appeals (1) from a judgment of the Supreme Court (Rumsey, J.), entered March 15, 2000 in Broome County, upon a verdict rendered in favor of defendants, and (2) from an order of said court, entered September 12, 2000 in Broome County, which, inter alia, denied plaintiffs' motion to set aside the verdict.

On or about April 17, 1996, plaintiff Helen Knish (hereinafter plaintiff) lost the sight in her left eye due to a blockage of the blood supply to the optic nerve resulting from temporal arteritis, an inflammation of the area surrounding the arteries leading to the eyes, head and jaw. This medical malpractice action against plaintiff's ophthalmologist, defendant John F. Meehan (hereinafter defendant), is grounded on the assertion that defendant deviated from the applicable standard of reasonable care by failing to properly diagnose plaintiff's condition at an April 16, 1996 office visit, a time when a correct diagnosis and prompt administration of intravenous steroids could have prevented plaintiff's irreversible blindness. Upon the trial of the action, the jury determined that defendant deviated from the standard of reasonable care in his examination and diagnosis of plaintiff on April 16, 1996, but that such deviation was not a substantial factor in causing the blindness in plaintiff's left eye. Plaintiffs appeal the judgment entered on the jury verdict in favor of defendants, as well as the order denying plaintiffs' subsequent motion pursuant to CPLR 4404 (a) to set aside the verdict as against the weight of the evidence.

Based on the evidence adduced at trial, it is our view that the jury's findings of negligence and lack of proximate cause cannot be reconciled with one another, requiring that we reverse the judgment and order appealed from, grant plaintiffs' motion to set aside the verdict and remit the matter to Supreme Court for a new trial. Viewed in a light most favorable to defendants, the trial evidence showed that plaintiff, who had already lost the sight in her right eye due to a retinal detachment and was being treated by defendant for macular degeneration and a cataract in her left eye, sought to see defendant approximately 10 days in advance of her regularly scheduled six-month examination because of problems she was

having with headaches, diminished vision and seeing a "spider web" (black spots observed by the patient in her field of vision). She was given an appointment for 4:30 P.M. on April 16, 1996.

Plaintiff was first seen by Linda Dean, a certified ophthalmic assistant who was serving as a "screener" for defendant. Because she could see that plaintiff's previous appointment had been about six months earlier, Dean erroneously concluded and recorded on plaintiff's chart that plaintiff was in for a six-month progress check. Dean took plaintiff's history and recorded her complaints as a gradual decrease in the vision in her left eye, an increase in headaches and seeing a "spider web" for five days. In her testimony, Dean indicated that the five-day modifier related to all three symptoms, but defendant testified that he took it to pertain only to the complaint of a "spider web." Dean checked plaintiff's visual acuity and noted that plaintiff's vision had deteriorated from 20/60 on October 24, 1995 to 20/80 and that there was a significant drop in her near vision. Finally, at approximately 4:35 P.M., Dean administered a dilating agent in plaintiff's left eye, in preparation for defendant's visual examination of her retina.

Because of plaintiff's demonstrated susceptibility to retinal detachment, defendant's immediate focus was on plaintiff's complaint of "floaters" (which he equated with "spider web"), a recognized symptom of retinal detachment. A thorough examination of plaintiff's retina, however, disclosed no detachment or any significant change in her preexisting cataract or macular degeneration conditions. Defendant also noted that the optic nerve appeared normal and there was no evidence of any compromise of the blood supply to it. Defendant therefore concluded that plaintiff's retina was not detaching, her "floaters" were benign and any decrease in her vision was attributable to her preexisting conditions. Defendant sent plaintiff home with instructions to return in six months for her next regular checkup. Sometime during that night, plaintiff suffered irreversible damage to the optic nerve in her left eye as a result of the occlusion of her temporal artery.

At trial, plaintiffs' expert, Andrew Dahl, testified that plaintiff's symptomology and complaints on April 16, 1996 were indicative of temporal arteritis and not consistent with the diagnosis of cataract or macular degeneration. It was Dahl's opinion that, because most people show some signs or symptoms one to three weeks prior to a major vascular episode, defendant should have considered the diagnosis of temporal arteritis and taken appropriate steps to confirm or rule out that condition. He also stated that, had defendant conducted an ap-

propriate examination on April 16, 1996, including visual field testing, pupil size and reactivity assessment and palpation of plaintiff's temporal arteries, and made an effort to elicit relevant information from plaintiff, including the location, severity and frequency of her headaches and the specific nature of her visual disturbances and fluctuations, he would have been better able to diagnose temporal arteritis on that date. Finally, Dahl testified that the care and treatment defendant rendered to plaintiff on April 16, 1996, and his failure to consider the diagnosis of temporal arteritis, deviated from accepted standards of medical care and that, had defendant properly diagnosed plaintiff's condition and commenced steroid treatment on April 16, 1996, there was a substantial possibility that plaintiff would have retained her vision.

Defendant offered his own testimony and that of ophthalmologist James Aquavella to counter Dahl's testimony. According to Aquavella, temporal arteritis is somewhat rare and very difficult to diagnose, and the symptoms described by plaintiff were not necessarily suggestive of that condition. Further, given plaintiff's chief complaint of "floaters" or a "spider web," Aquavella felt that it was not unreasonable for defendant to focus on the possibility that plaintiff was suffering from a second retinal detachment and that defendant acted in accordance with accepted standards of care in evaluating plaintiff's complaints of headaches and a gradual reduction in vision. Notably, except for defendant's highly equivocal testimony that timely administration of steroid treatment "may or may not" have prevented the occlusion of the blood vessel to plaintiff's left eye, no defense experts addressed the issue of causation.

Although we recognize that jury verdicts, particularly those rendered in favor of defendants in tort cases, are to be accorded deference on review (*see, Campbell v City of Elmira*, 84 NY2d 505, 513; *Stilloe v Contini*, 213 AD2d 815, 818), given the jury's finding that defendant deviated from the standard of reasonable care in his examination and diagnosis of plaintiff on April 16, 1996 and the uncontradicted evidence that, had a proper diagnosis been made, timely administration of intravenous steroid therapy would more likely than not have prevented plaintiff's blindness, we are constrained to the conclusion that the jury's finding on proximate causation is fatally inconsistent and could not have been reached upon any fair interpretation of the evidence (*see, Lolik v Big V Supermarkets*, 86 NY2d 744, 745-746; *Petrone v Mazzone*, 284 AD2d 634, 636). Notably, we are not persuaded by defendants' argument that because Supreme Court charged the jury on several different malprac-

tice theories, its verdict may have encompassed only one or a few of the less significant deviations—ones that would not necessarily have affected the outcome.

As correctly contended by plaintiffs, the various allegations of improper recordkeeping and inadequate history-taking on the part of both Dean and defendant did not constitute separate theories of malpractice but were, instead, multiple interrelated deviations from accepted standards of medical care which, taken as a whole, contributed to defendant's failure to properly diagnose plaintiff's condition. Given that it was defendant's ultimate responsibility to obtain a proper history and determine the precise nature of plaintiff's symptoms, the jury could not properly have based its finding of malpractice solely on Dean's negligent workup. It was defendant's failure to ensure that the requisite tests were performed that constituted a deviation from the standard of reasonable care. Further, the contentions that Dean may have been in error in interpreting her own chart entry or that, because plaintiff was a poor "historian," defendants would not have been able to obtain a proper history even if she had been asked appropriate questions, are based on nothing more than speculation. Finally, any possible conclusion by the jury that a proper diagnosis made on April 16, 1996 would have come too late to save plaintiff's vision was unsupported by competent medical evidence in the record (*cf.*, *Smith v Lillian V. Ney, M.D., P.C.*, 267 AD2d 1017).

In view of our determination to reverse the judgment and order appealed from and order a new trial, plaintiffs' remaining contentions have been rendered academic.

Crew III, Peters, Carpinello and Mugglin, JJ., concur. Ordered that the judgment and order are reversed, on the law, with costs, motion to set aside the verdict granted, and matter remitted to the Supreme Court for a new trial.